[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 154 
James W. Johnston was indicted for the capital murder of one Mildred Hart in violation of § 13A-5-40 (a)(8), Code of Alabama 1975. The jury found the appellant guilty as charged in the indictment and after a hearing on aggravating and mitigating circumstances he was sentenced to life imprisonment in the penitentiary without the benefit of parole.
This case arose out of a homicide which occurred on May 15, 1982, in Andalusia, Alabama. The morning of May 15, Mrs. Hart had been to the grocery store and to visit a friend, Mary Braxton, before returning home. The record shows that Mrs. Hart left Mary Braxton's home at sometime around eleven o'clock. The record *Page 155 
shows that as Mrs. Hart was entering her home to unload her groceries she was attacked. The perpetrators of the crime tied electrical cord around her wrists and ankles, tied her to the corner posts of her bed, and raped her. She subsequently suffered death by ligature strangulation. Mrs. Hart was carried from her bedroom to the bathroom and placed face down in a bathtub half-full of water. Dr. Thomas Gilchrist of the Alabama Department of Forensic Sciences established the time of death to be within four hours either before or after twelve noon on May 15, 1982.
Early Sunday morning, May 16, 1982, Mary Braxton became worried about Mrs. Hart since she had not heard from her that morning. She testified that they made a regular practice of calling one another every morning to make sure everything was all right. She telephoned Mrs. Hart several times and there was no answer. She then telephoned a neighbor of Mrs. Hart and asked the neighbor to meet her at Mrs. Hart's home. As the two women were walking through the garage of the Hart residence they noticed a bag of groceries in Mrs. Hart's car. They called for Mrs. Hart, then when they did not get a response opened the door of the home and stepped into the kitchen. Upon entering they saw groceries littering the floor and noticed a broken window in the kitchen. They immediately left the home and called the police.
Due to an error in the trial of the case, all issues of error except the following have been pretermitted from discussion.
 I
The appellant contends that three pre-arrest statements made by him to police officers were improperly admitted at trial for consideration by the jury due to several reasons.
 (A)
The appellant first contends that these statements were made at a time when the appellant was in unlawful custody and thus they are inadmissible. The record shows that on the afternoon of May 16, 1982, the day the murder was discovered, Investigator Treadaway observed the appellant make approximately eight trips past the Hart residence while the investigation was in progress, several times venturing inside an area roped off for police personnel only. Treadaway talked to the appellant at one point and the appellant stated that he had not seen anyone strange in the neighborhood. Later the same afternoon Treadaway went to the boarding house where appellant lived to talk with the appellant. When the appellant appeared, Treadaway asked him if he could talk with him, and at that point the appellant immediately and spontaneously said that he did not rape the woman, he did not kill her, and he did not drag her to another room. (R. 167, 392, 402) At this point the appellant was not in custody, under arrest, nor restrained of his freedom in any way. (R. 166) The appellant was read his rights at this point, which he stated he understood, and agreed to go downtown for fingerprinting after being cautioned that he did not have to go. (R. 168)
The appellant made a second statement that he did not rape that woman and he did not kill her (R. 402) on the way to the police station. This statement was also spontaneous, voluntary, and not prompted by interrogation. (R. 393)
The appellant made a third statement while being fingerprinted. This statement was also spontaneous, voluntary, and not prompted by any interrogation. The appellant stated that he did not rape the woman, did not kill her, and did not drag her to the closet. (R. 402)
In order to deem a pre-arrest statement inadmissible we must determine whether the challenged statement was made pursuant to a custodial interrogation or custodial setting. A custodial interrogation has been defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Miranda v. Arizona, *Page 156 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Oregon v.Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). The procedural safeguards outlined in Miranda do not apply to "traditional investigatory functions (such) as general on-the-scene questioning." Hall v. State, 399 So.2d 348
(Ala.Cr.App. 1981). The facts of each case must be examined in order to determine whether the defendant was questioned merely as part of a general investigation or was subjected to a custodial interrogation. See Cork v. State, 433 So.2d 959
(Ala.Cr.App. 1983); Hall, supra. Moreover, a voluntary, spontaneous statement made by a defendant to police officers, before any questions have been asked, is admissible against the defendant even though he has not been given his Miranda
warnings. Jelks v. State, 411 So.2d 844 (Ala.Cr.App. 1981);Ervin v. State, 399 So.2d 894 (Ala.Cr.App.), cert. denied,399 So.2d 899 (Ala. 1981); Terry v. State, 397 So.2d 217
(Ala.Cr.App.), cert. denied, 397 So.2d 223 (Ala. 1981).
In the present case the appellant was not subject to any interrogation by law enforcement personnel. He voluntarily agreed to go to the police station after being cautioned that he did not have to go. He voluntarily and spontaneously made the statements. He was read his Miranda warnings which he stated he understood. Furthermore, after having made the three statements, none of which were prompted by police questioning, he was taken back to his place of residence. After reviewing the totality of the circumstances involved in this case, we find no element of coercion or custody present. Therefore, the statements were properly admitted by the trial court.
 (B)
The appellant also contends that these statements should not have been admitted due to the appellant's defective mental condition.
The mental subnormality of a defendant does not in and of itself render a statement involuntary. Shorts v. State,412 So.2d 830 (Ala.Cr.App. 1981); Ellis v. State, 398 So.2d 402
(Ala.Cr.App. 1981) and cases cited therein. The totality of the circumstances under which the statement of the appellant was given clearly shows that it was voluntarily given after a knowing and voluntary waiver of rights despite the fact that the appellant had a full scale I.Q. of sixty-seven and was classified as borderline mentally retarded. See Jackson v.State, 375 So.2d 1271 (Ala.Cr.App.), cert. denied,375 So.2d 1274 (Ala. 1979); Rhine v. State, 360 So.2d 1056 (Ala.Cr.App.), cert. denied, 360 So.2d 1060 (Ala. 1978); Twymon v. State,358 So.2d 1072 (Ala.Cr.App. 1978). There was no interrogation of the appellant whatsoever in this case. His statements were purely spontaneous and voluntary, which distinguishes this case from others in which this court has held statements to be inadmissible due to mental defects. See Hines v. State,384 So.2d 1171 (Ala.Cr.App.), cert. denied, 384 So.2d 1184 (Ala. 1980); Garrett v. State, 369 So.2d 833 (Ala. 1979). Moreover, this court has held statements to have been voluntarily given after a knowing waiver of rights in other cases in which the defendant had a much lower I.Q. than in the present case. SeeShorts, supra; Brown v. State, 393 So.2d 513 (Ala.Cr.App. 1981).
 II
The appellant argues that the arrest warrant was insufficient as being conclusory and therefore his subsequent arrest was invalid. In connection with this argument the appellant contends that a statement made by the appellant subsequent to his arrest was not admissible.
 (A)
An affidavit which is conclusory on its face and an arrest pursuant to such warrant will be deemed invalid. However, this court has held that in such instances the affidavit may be cured by oral testimony of the issuing magistrate at trial. The testimony should be such that the magistrate testifies that the officer to whom the *Page 157 
warrant was issued recited sufficient reason for the issuance of the warrant. Malone v. State, 51 Ala. App. 19, 282 So.2d 367
(Ala.Cr.App.), cert. quashed, 282 So.2d 371 (Ala. 1973);Morrison v. State, 398 So.2d 730 (Ala.Cr.App. 1979), reversed on other grounds, 398 So.2d 751 (Ala. 1981).
In this case Eleanor Rowell, the issuing clerk, was called to the stand to testify and although she stated that she did not recall if Officer Treadaway recited any independent facts sufficient to establish probable cause for arrest, the trial judge ruled that such cause was presented through testimony. We agree with the trial judge on this matter. There was sufficient evidence of probable cause presented to justify the issuance of the arrest warrant.
 (B)
Moreover, in this case there was sufficient probable cause to arrest the appellant without a warrant pursuant to §15-10-3 (3), Code of Alabama 1975. This section states that an officer may arrest without a warrant when a felony has been committed and he has reasonable cause to believe that the suspect committed the act.
In this case Officer Treadaway knew of the statements made by the appellant on May 16; he had in his knowledge that Mrs. Hart had been harassed by the appellant in the recent past; he saw the appellant make more than eight trips past the Hart residence while the investigation was in progress, several times venturing inside the roped off area for police personnel only; the investigation had revealed several reddish-brown facial hairs found in the Hart residence and the appellant had a beard which matched the color. Therefore, under these circumstances, the officer had reasonable cause to arrest the appellant and the subsequent arrest was valid.
 (C)
The appellant contends that a statement made by the appellant after his arrest should not have been admitted due to the invalidity of arrest and therefore demands reversal of the judgment.
We have held the arrest to have been validly made, therefore we will consider whether the appellant's statement was admissible as being a voluntary statement. The record shows that when the appellant was arrested he was advised of hisMiranda warnings and taken to the hospital to obtain fingernail scrappings, blood tests, nasal sample, and hair samples.
Investigator Don Tucker of the Alabama Bureau of Investigation testified that while at the hospital the appellant made a statement to him. He testified that the statement took place approximately one hour after the time of arrest; that no one offered the appellant any reward or hope of reward to make a statement; that no one threatened the appellant; that the statement was not subject to any interrogation and was freely and voluntarily given. He further testified that when he entered the examining room where the appellant was waiting on the doctor, that the appellant asked him who he was, if he was the one that arrested him. When Investigator Tucker told the appellant who he was the appellant stated, "Well, I'm your man. It took you three days to get me, but you'll never convict me because they say I'm crazy." (R. 447)
This court has held on numerous occasions that voluntary statements, which are not the object of any threat or duress are admissible. It is a well settled rule of law in Alabama that a statement made subsequent to arrest is prima facie involuntary and inadmissible at trial, and that the State must demonstrate voluntariness and a Miranda predicate in order to get admission of the statement. Thomas v. State, 373 So.2d 1167
(Ala. 1979); Eakes v. State, 387 So.2d 855 (Ala.Cr.App. 1978);Lewis v. State, 295 Ala. 350, 329 So.2d 599 (Ala. 1976). The voluntariness of a statement is, however, a question of law to be determined by the trial court upon preliminary proof and that court's decision will not be disturbed on appeal unless it appears contrary to the great weight of evidence, *Page 158 
or is manifestly wrong. Balentine v. State, 339 So.2d 1063
(Ala.Cr.App.) cert. denied, 339 So.2d 1070 (Ala. 1976); Danielsv. State, 53 Ala. App. 666, 303 So.2d 166 (Ala.Cr.App. 1974);Stewart v. State, 49 Ala. App. 681, 275 So.2d 360 (Ala.Cr.App. 1973).
There is ample evidence whereby the court could have determined that appellant's statement was voluntarily given. Thus, the trial court's decision on this issue must be upheld.
 III
The final issue to be determined on this appeal is whether or not the trial court erred to reversal in allowing the prosecution to introduce a prior inconsistent statement of a defense witness. The appellant argues that the prosecution failed to lay a proper predicate to introduce the prior inconsistent statements of defense witness William C. Metcalf, the owner of the boarding house where the appellant lived at the time the crime was committed.
Mr. Metcalf testified as follows on direct examination (R. 633, 634):
 "Q All right, sir. Now do you remember the Saturday before they found her body on Sunday?
"A Yes, sir.
 "Q All right, sir. Was J.W. living at your boarding house then?
"A Yes, sir.
 "Q All right, sir. What time do ya'll serve lunch at your boarding house?
"A Eleven-thirty.
 "Q And did you serve at eleven-thirty on May the 15th?
 "A Yes, sir. Now I couldn't say that it was exact, but eleven-thirty was our time to serve lunch and it was approximately eleven-thirty. It might have varied five minutes one way or the other, but it was approximately eleven-thirty.
 "Q All right. And did J.W. Johnston eat lunch at the boarding house on that Saturday, May the 15th?
"A J.W. Johnston ate lunch there that day.
 "Q All right, sir. Now, what time did you serve supper or the evening meal?
"A Four-thirty.
 "Q All right. On Saturday, May the 15th, did J.W. Johnston eat supper at your boarding house?
"A He ate supper, yes, sir."
On cross-examination Mr. Metcalf testified as follows (R. 637, 638):
 "Q Okay. And it is your testimony that he was at the boarding house for lunch on the 15th, which was at eleven-thirty, is that correct?
"A That's correct."
This was the only exchange that took place on cross-examination concerning the appellant's eating lunch at the boarding house or whether or not Mr. Metcalf had made a prior statement about this to police officers. After the defense rested their case, the State called two rebuttal witnesses — Officer Treadaway and Investigator Tucker.
The following exchange took place upon the direct examination of Officer Treadaway (R. 650-652):
 "Q Billy, do you recall having a conversation with — first of all, do you know Mr. William C. Metcalf?
"A Yes, sir.
 "Q Where does he live or where did he live back on May the 16th and May the 17th of 1982?
 "A He lived on Watson Street, just below the Hart residence.
 "Q And did you have a conversation with Mr. William Metcalf back on May the 16th of 1982?
"A Yes, sir, I did.
 "Q Did you go to the Metcalf Boarding Home on that occasion?
"A Yes, sir, I did.
 "Q Do you recall during the course of that conversation, asking Mr. Metcalf whether the Defendant, J.W. Johnston, had eaten lunch there at the boarding house?
"A Yes, sir. . . . *Page 159 
 "MR. COOK: Wait a minute now. That's — the predicate hadn't been laid for this. He didn't ask Mr. Metcalf about that. He would first have to ask him.
The predicate hadn't been laid for what they. . . .
"THE COURT: Mr. Metcalf said he did eat there.
"MR. COOK: Wait a minute. But he. . . .
"THE COURT: Take the jury out.
 "MR. LANIER: I think the State is entitled to have a witness to come forward to testify as to the conversation he did have with Mr. Metcalf.
 "MR. COOK: He didn't ask Mr. Metcalf, Mr. Metcalf. . . .
"THE COURT: He didn't, but. . . .
"MR. COOK: I know, but. . . .
"THE COURT: . . . you did.
 "MR. COOK: Well, but on cross, he was supposed to say, Mr. Metcalf, didn't you tell Officer Treadaway that — whatever it is and Metcalf say, No, I didn't do that. Then they come in to prove that he did. They haven't got their little act — hadn't taken each step in sequence and we object to it.
"THE COURT: Well, you want to go ahead with it?
"MR. LANIER: Yes, sir.
"THE COURT: Okay. Overrule the objection, then.
"MR. PERSONS: We respectfully except.
 "THE COURT: Bring them back in. (continued direct examination)
 "Q I believe I ask you if you had a conversation with Mr. Metcalf on May the 16th, 1982. . . .
"A Yes, sir.
 "Q And during the course of that conversation, do you recall hearing Investigator Tucker ask Mr. Metcalf, `Did Bell and Johnston eat there on Saturday?'
"A Yes, sir.
". . . .
 "Q And do you recall Mr. Metcalf stating that, `They did not eat lunch there?'
 "A He said he did not believe they eat lunch there, but he knowed they eat supper there."
After cross-examination of Officer Treadaway, the State called Investigator Tucker to the stand. He recited the same facts as Officer Treadaway, to which the defense again objected and was again overruled.
We must agree with the appellant's argument on this issue. The trial court did err in overruling his objection to this prior inconsistent statement. Generally, a witness, who on cross-examination denies that he made a statement out of court which is inconsistent with his testimony on direct examination, may be impeached by use of another witness to whom the inconsistent statement was made. However, a witness cannot be impeached by proof of contradictory statements made by him, whether oral or in writing, without first asking him whether he made such declarations, specifying with reasonable certainty the time when, the place where, the person to whom such statement was made and the substance of such statement.Scrafford v. State, 414 So.2d 179 (Ala.Cr.App. 1982); Juniorv. State, 411 So.2d 850 (Ala.Cr.App. 1982); Starling v. State,398 So.2d 337 (Ala.Cr.App.), writ denied, 398 So.2d 342 (Ala. 1981); Walker v. State, 369 So.2d 814 (Ala.Cr.App. 1978), reversed, 369 So.2d 825 (Ala. 1979), on remand, 369 So.2d 826
(Ala.Cr.App. 1979); Gamble, McElroy's Alabama Evidence, § 157.01 (1) (3rd Ed. 1977).
This error could have easily been cured by recalling to the stand all of the necessary witnesses, and if the impeached witness denied having made the contradictory statement then any predicate error is cured. Gamble, McElroy's Alabama Evidence, § 157.01 (8, 9) (3rd Ed. 1977).
This testimony was prejudicial to the appellant. Earlier testimony by Dr. Thomas Gilchrist had established the time of death to be within four hours, before or after, twelve noon on May 15, 1982. Mary Braxton had earlier testified that the *Page 160 
victim, Mrs. Hart, had left Ms. Braxton's home at approximately eleven o'clock that same morning. The trial court's allowing the prior inconsistent statement to be admitted served to destroy the appellant's only evidence of alibi.
After reviewing the applicable law and authority, we must hold that the trial court was in error on this issue. Therefore, the judgment of the trial court is due to be and is hereby reversed and remanded.
REVERSED AND REMANDED.
All the Judges concur.
TAYLOR, J., concurs in result only.